UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

BRANDON WALKER,

                              Plaintiff,

                -vs-

UNITED PARCEL SERVICE GENERAL SERVICES CO., and
UNITED PARCEL SERVICES, INC.,

                              Defendants.

DECISION AND ORDER

16-CV-6031 CJS

## APPEARANCES

For Plaintiff:                     Karen Sanders, Esq.
                                  Harris, Chesworth, Johnstone & Welch LLP
                                  300 Linden Oaks, Suite 100
                                  Rochester, New York 14625
                                  Tel: (585) 899-1424

For Defendant:                  Angela F. Ransom, Esq.
                                  Greenberg Traurig LLP
                                  3333 Piedmont Rd., NE, Suite 2500
                                  Atlanta, Georgia 30305
                                  Tel: (678) 553-2100

                                  David W. Long-Daniels, Esq.
                                  Greenberg Traurig LLP
                                  3333 Piedmont Rd., NE, Suite 2500
                                  Atlanta, Georgia 30305
                                  Tel: (678) 553-2100

## INTRODUCTION

**Siragusa, J.** This is an employment discrimination case, pursuant to 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1981, and the New York State Human Rights Law ("NYHRL") § 296, *et seq.*, in which Plaintiff makes claims of disparate treatment and retaliation. It is before the Court on Defendants' motion for summary judgment, filed on March 31, 2017, ECF No. 17,

and Plaintiff's cross-motion to strike, filed on May 1, 2017, ECF No. 23. For the reasons stated below, the Court grants Defendants' motion, and denies Plaintiff's application.

FACTUAL BACKGROUND

The parties have filed statements of fact as required by Loc. R. Civ. P. 56 and the Court takes the following facts from those statements[1] with disputes noted below. Plaintiff is an African-American male formerly employed by United Parcel Services, Inc. ("UPS") Walker Aff. ¶ 3, May 1, 2017, ECF No. 19. Walker Dep. 130:9–131:4, May 31, 2017, ECF No. 17-4; Compl. ¶ 13, Jan. 20, 2016, ECF No. 1. Plaintiff never worked for United Parcel Service General Services Co.

UPS has a number of anti-discrimination and anti-retaliation policies in place. UPS employees may bring complaints to a UPS supervisor, manager, Human Resources, or the UPS Help Line.[2] UPS investigates reported complaints and takes corrective action if warranted. Plaintiff contends he was unaware of UPS's policies or the manner provided for making discrimination complaints within UPS.

UPS also has an Employee Dispute Resolution program ("EDR") to resolve issues raised by any non-union or management UPS employee in the United States. EDR is a five-step program, and UPS states that all covered employees, including Plaintiff, receive training on the program. At Plaintiff's work location, UPS posted this information on a bulletin board. Plaintiff claims that he was unaware of the program and that once he left UPS, he no longer had access to the bulletin board.

---

[1] The Court relies on the allegation in the complaint to establish that Plaintiff is an African-American male, since that fact is not included in either party's statement of undisputed facts.

[2] Plaintiff contends that the UPS Help Line is not available to terminated employees.

Plaintiff began his employment with UPS as a loader on June 21, 2000. From then until November 29, 2005, he worked as a loader, unloader, and sorter. On November 29, 2005, UPS promoted Plaintiff to a part-time hub supervisor, and he worked at that job until June 1, 2010. On June 1, 2010, UPS promoted Plaintiff to a part-time local sort supervisor, and he worked at that job until April 15, 2013.

On April 9, 2013, Plaintiff interviewed for the position of full-time preload supervisor. Two Caucasian employees were also interviewed for the same position, but Division Manager John Tierney chose Plaintiff for the position over the other candidates. Plaintiff worked in that position until ending his employment with UPS on June 24, 2014. UPS claims Plaintiff received training throughout his employment, but Plaintiff disputes this contention, stating that he "was given little to no training in his new job as a full time pre-load supervisor" and "was denied the help that white supervisors were given on a routine basis, setting him up for failure." Pl.'s Response to the Statement of Material Facts Not in Dispute ¶ 19, May 1, 2017, ECF No. 21.[3]

At the end of May 2013, after becoming a full-time supervisor, Plaintiff sent an email to a colleague with a subject line of "RE: Management Reportback Locations," stating, "This sucks, we get to sit around with a bunch of old men that need to retire!" Plaintiff's email of

---

[3] In support of this contention, Plaintiff cites to "Transcript pp. 60–63" and "Walker Aff. ¶[¶] 9, 12, 15–17." Pl.'s Statement ¶ 19. Plaintiff's full deposition transcript is attached to Long-Daniels Affirmation as Ex. A. Page 60 of that transcript does not discuss training, but refers to the third time UPS disciplined Plaintiff in one year. Page 62 discusses the first time Plaintiff was alone on the supervisor job and asserts that Jeff Kessler, Plaintiff's supervisor, went on vacation and asked John Tierney to get help for Plaintiff to which he replied, "I'm not giving Brandon help." Page 62 further describes the first error Plaintiff committed with regard to "closed cars," and on page 63, Plaintiff states that he "missed a package car that was in the building," that it was a mistake, and acknowledged that it "cost the company a lot of money." Nowhere in the three pages is training discussed. A search of the entire transcript mentions nothing about UPS job training, only training on workplace harassment. In his affidavit, Walker states that he received "little to no training," ¶ 9, that he did not receive "direct training" on closed trucks, ¶ 12, and, in reference to the incident described in his deposition testimony, that he received no help, whereas "over the fourteen years [he] was employed [] white counterparts were given training and assistance when needed," ¶ 17.

May 29, 2013, Def.s' Exhibit K, [ECF No. 17-12](ECF No. 17-12). Plaintiff characterizes the statement as "an off hand comment to Bryan Hughes which was not related to his duties." On December 2, 2013, Plaintiff made a comment in relation to UPS's hiring of an older female employee, stating, "UPS should stop hiring people that are that old to do a job they couldn't clearly do." He contends that following counselling, the situation never reoccurred.

As a full-time preload supervisor, Plaintiff was responsible for completing yard checks. These checks consisted of visually inspecting his assigned UPS trailers to make sure the trailers were empty and that packages were properly processed. He was required to certify in writing the completion of his yard check. Packages left in trailers would not be delivered on time and would cost UPS money in the form of refunds to the customers and overtime pay to deliver them. Plaintiff states that UPS did not terminate a Caucasian part-time supervisor who had erroneously signed off on yard check forms.

When hired, Plaintiff signed an Honesty in Employment Acknowledgement, which stated in part as follows: "DISHONESTY WILL result in immediate dismissal and possible criminal prosecution," and that when UPS "discover[s] a dishonest person in our organization, we will deal with that individual quickly and firmly. For our company to be known for its integrity, each one of us must meet high standards." Honesty in Employment (Aug. 21, 2000) Def.s' Ex. M, [ECF No. 17-14](ECF No. 17-14). In that regard, Plaintiff states that UPS did not hold his white counterparts to the same standard to which he was held.

Within a month of becoming a full-time supervisor, John Tierney, who had hired Plaintiff, caught Plaintiff in his office checking his personal Hotmail account during work hours, contrary to UPS's rules. Plaintiff admitted during his deposition testimony that one time he threw a package down to damage it so he would not have to deliver it. Walker Dep. 75:15–22. He also admitted that he put a package in his drawer one time, again so he would not

have to deliver it. *Id*. 75:23–76:2. All these actions constituted violations of UPS's integrity policy. *Id*. 76:12–21. Plaintiff further admitted that on July 5, 2013, he failed to follow proper procedures when scanning closed cars. As a result, he caused more than 500 packages to be untimely processed and delivered. This error cost UPS money as well. Plaintiff was questioned about the incident and provided the following answers to the following questions:

> A. So Jay Barnhart is on vacation. Antonio Aponte runs—Jay runs the sort aisle.
>
> Q. In the preload?
>
> A. In the preload. He's supervisor on every belt.
>
> Q. He works for you?
>
> A. Yes. Jay works for me. Jay runs the sort aisle—no. Sorry. Jay runs the unload. Antonio Aponte runs the sort aisle. Jay was on vacation. I think it was in February; it was after peak. Antonio was left to run the sort aisle and the unload by himself.
>
> Q. Who left him to do that? You; right?
>
> A. No, not me.
>
> Q. You were the supervisor.
>
> A. Decisions come down—decisions come down.
>
> Q. But you were part of the decision.
>
> A. Part of the decision. So basically Jeff Kessler told me, You have to do your job, your duties, and try to help out Antonio when you can." And that's—
>
> Q. But you're not denying that he was your subordinate and you were responsible for him?
>
> A. Well, you're responsible for everybody. If you're management, you can tell anybody what to do. They all report to you.
>
> Q. Yeah, but there's no dispute that you were responsible for this young man—
>
> A. No.
>
> Q. —who was left to do the work?
>
> A. No.

Q. All right. So what happens?

A. So we go to do the yard—I go to do the yard check. There was a computer inside by the—by doors 8 and 9 next to a man door that you can go outside.

Q. Tell us what a man door is.

A. A man door is an exit, exit door.

Q. Just a regular door that you open and go out?

A. Correct, on the building. There was a computer next to that. Every day when you start the unload—the preload, there was a number. So it's starts at, like, 10 percent. So as the shift goes on, the number gets higher and higher and higher, let's you know that you're—

Q. Making progress?

A. You're making progress. So I go outside to do the yard check and do the yard check, there's nothing—there's nothing outside that's—no trailer outside on the fence line with packages inside of it.

Q. Let's break it down. Were there trailers outside?

A. Yes. There's always trailers outside. There's always trailers outside at every UPS building. There's no building that does not have trailers on the premise [sic].

Q. So your statement is there were trailers outside by the fence?

A. Correct.

Q. But they were all empty?

A. They were all empty. So I come back inside, I look at the computer. The numbers don't match. The numbers don't match—we have a sheet, and all the trailers are on the sheet. The numbers don't match the sheet what's on the computer.

Q. In other words, the computer shows X numbers of trucks are unloaded but—

A. Yeah.

Q. But the numbers—

A. The numbers don't match. Something—in my head something was not right. So I immediately contact Antonio on the radio. "Something's not right here. The numbers don't match up." So I go back outside, double-check to make sure I didn't miss anything, just making sure. Nothing's missing outside. So I come

back inside again. We start looking at the doors—the unload doors. The doors that are docked up to the building. Antonio finds there was an unload door that had a trailer on it. The door was shut. The outside door of the building was shut. The trailers was butted [sic] up to that. Usually what happens is when a trailer is empty and if it's staying on property, you shut that—you shut the door. So he opens—pops open the door, pops open the trailer; there's the trailer—there's the numbers. So that trailer got found because of the yard check, not missed because of the yard check.

Q. But before it got found, it was lost?

A. No one knew where it was.

Q. And so it got—it was lost, because no one had popped the door open to see if there was something in the trailer; right?

A. No one.

Q. And that was part of your job; right?

A. Anyone's job.

Q. But your job in particular as the preload full-time sup?

A. Actually, no, it wouldn't have been my job. It would have been Antonio's job.

Q. Well, Antonio works for you, doesn't he?

A. Yeah. But that's like saying that if a loader missorts or a driver doesn't report late air, that driver can report to me.

Q. Didn't you acknowledge in your own handwriting that you were responsible for that incident in February?

A. I did.

Q. And you said you would never let it happen again?

A. I did.

Q. That you would follow policies?

A. I did.

Q. And that you understood that if it happened again, you could be terminated?

A. I did.

Q. So there's no dispute that it was part of your responsibility?

A. I did. But what I'm disputing is how they're saying it.

Q. I don't want to quibble with the language. At the end of the day part of your job was to make sure that trailer was empty. When you recognized there was a problem, it was only then that you discovered that the trailer was full and hadn't been emptied; correct?

A. No, I don't—I don't believe so.

Q. Was that trailer timely processed?

A. Was it processed late?

Q. Yes.

A. Than what it should have been? Yeah.

Q. That's part of the problem, isn't it? Because it's late, it costs money to UPS; correct?

A. I don't know if it did or not. The trailer got unloaded within literally 15 minutes. Those drivers—those drivers still left on time.

Q. Did the products get to the customers on time? That's the question, isn't it?

A. I can't answer that.

Q. Right. Because some of those products could have had next-day air or could have had—

A. They would not.

Q. They could have had products that had to be delivered by a certain time.

A. Not a ground trailer.

Q. Not a ground trailer. So you're saying in your mind there was no problem, because the products got unloaded in 15 minutes, and everything got where it was supposed to be?

A. No, I'm not saying that there's not a problem. But you're saying to me that there's airs on a trailer; and I'm saying no, that was not an air trailer. It was a ground trailer. There's a difference between air and ground.

Q. I got you on that. But there was a trailer, whether you call it air or ground, that was not emptied timely?

A. I will say yes.

Q. And you were called into question about that?

A. Yes. I did not let Antonio take the hit. I said I would take the hit.

Q. You took the hit because you wanted to?

A. Because I felt that it wasn't fair for him to.

Q. Was it fair for you to?

A. Someone's got to fall on the sword. They're going to blame somebody. I'd rather it have been me than him.

Q. So you fell on the sword?

A. Yes.

Q. And you knew there would be consequences if you had that problem again?

A. Yes.

Q. And you had that problem again in June?[4]

A. Yes.

Q. There was a whole trailer, the air trailer we talked about, that was—had those 88 packages on it; right?

A. Right.

Q. And you were subject to disciplinary action because of that?

A. Correct.

Q. You chose to resign as opposed to being disciplined?

A. I didn't choose to resign.

Q. Did you write it in your own handwriting?

A. Because I was told to write it in my handwriting.

Q. But nobody had your hand on the pen forcing you to write it, did they?

A. No. But when someone says to you, "You can resign; or we'll terminate you, and then we're going to fight your Unemployment," yeah, you're going to resign.

---

[4] UPS states the problem occurred on June 5, 2014. UPS Statement of Facts ¶ 29, ECF No. 17-1.

9

> Yes. I had just bought a house, had a son due.
>
> Q. So you resigned. You made that choice; correct?
>
> A. Well, if somebody—
>
> Q. It may have been a tough choice, but you made the choice that you thought was best for you, correct, and your family?
>
> \* \* \*
>
> [Q.] You exercised the choice you thought was best for you; correct?
>
> A. Correct.
>
> Q. Nothing wrong with that. Sometimes in life we learn. We make choices, and we make—we take learning moments. You got your Unemployment?
>
> A. Yes.
>
> Q. Then you got you another job?
>
> A. Yes.

Walker Dep. 48:12–56:25, 57:19–58:4.

UPS disciplined Jeff Kessler ("Kessler"), Plaintiff's supervisor, because of the February missed load incident. Kessler acknowledged in correspondence to John Tierney "that further occurrences of this nature will lead to more serious consequences which may include demotion, suspension, or termination from my employment at UPS." Jeff Kessler memo to John Tierney (Feb. 27, 2014), Def.s' Ex. R, [ECF No. 17-19](ECF No. 17-19).

Plaintiff raises the following causes of action in his complaint: (1) Title VII race discrimination; (2) NYHRL race discrimination; (3) Title VII retaliation; (4) NYHRL retaliation; and (5) 42 U.S.C. § 1981 race discrimination and retaliation.

## STANDARDS OF LAW

### *Summary Judgment*

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, ... demonstrate

the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and "the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a) (2015). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996) (citation omitted).

The burden then shifts to the non‑moving party to demonstrate specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To do this, the non‑moving party must present evidence sufficient to support a jury verdict in its favor. *Id.* at 249. "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non‑moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir. 1993). The parties may only carry their respective burdens by producing evidentiary proof in admissible form. Fed. R. Civ. P. 56(c)(1). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non‑moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

### *Title VII (42 U.S.C. § 2000e et seq.)*

Title VII "makes it unlawful for an employer to discriminate against any individual with respect to the 'compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 436 (2d Cir. 1999) (citations omitted), *abrogated on*

*other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L.Ed.2d 345 (2006).

> To establish a *prima facie* case of race or national origin discrimination under Title VII, a plaintiff must show that: "(1) he belonged to a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012); *see also Mills v. S. Connecticut State Univ.*, 519 Fed. Appx. 73, 75 (2d Cir. 2013); *Ruiz*, 609 F.3d at 491—92.

*Sethi v. Narod*, 12 F. Supp. 3d 505, 2014 WL 1343069 (E.D.N.Y. 2014).

It is well settled that "claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII." *Torres v. Pisano*, 116 F.3d 625, 629, n.1 (2d Cir. 1997), *cert den.* 522 U.S. 997, 118 S. Ct. 563, 139 L. Ed. 2d 404 (1997). Consequently, unless otherwise noted, references to Title VII herein are also intended to refer to the NYHRL.

### *42 U.S.C. § 1981*

Section 1981 provides in pertinent part as follows:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). The same *McDonnell Douglas* burden-shifting analysis applies to § 1981 claims. *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 123 (2d Cir. 2004). With regard to retaliation claims under § 1981, the Second Circuit observed the following in an unreported case:

> Under this framework, "'but-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013).

12

*Alvarado v. Nordstrom, Inc.*, 685 Fed. Appx. 4, 7 (2d Cir. 2017).

### *Retaliation*

In *University of Texas Southwestern Medical Center v. Nassar*, _____ U.S. _____, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (Jun. 24, 2013), the Supreme Court held that because Title VII's retaliation provision is in a different section from its status-based section, a "but for" causation test applies in retaliation claims. "The text, structure, and history of Title VII demonstrate that a plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Id.*, 133 S. Ct. at 2534.

As the Court noted in *Brown v. Xerox Corp.*, 170 F. Supp. 3d 518, 531 (W.D.N.Y. 2016):

> "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Kwan v. Andalex Grp., LLC,* 737 F.3d 834, 846 (2d Cir.2013). "Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage." *Id.* at 847.

### *McDonnell Douglas Burden Shifting Framework*

The Court analyzes Title VII claims using the well-settled *McDonnell Douglas*[5] burden-shifting framework:

> A plaintiff establishes a prima facie case of discrimination by showing that he or she (1) is a member of a protected [group] . . . .; (2) was qualified to perform the duties required by the position; (3) was subjected to an adverse employment action; and (4) the adverse employment action occurred in circumstances that gave rise to an inference of discrimination. *See Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir.2003).

*  *  *

---

[5] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973).

> Once the plaintiff presents a prima facie case,[6] the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its employment decision. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L.Ed.2d 207 (1981). Upon the defendant's articulation of a legitimate, non-discriminatory reason, the presumption of discrimination arising from the plaintiff's prima facie showing "'drops out of the picture,'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L.Ed.2d 105 (2000) (*quoting St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S. Ct. 2742, 125 L.Ed.2d 407 (1993)); *see Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir.2000), and the burden of production shifts back to the plaintiff to adduce evidence sufficient for a reasonable jury to conclude that discrimination was a reason for the employment action, *see Schnabel v. Abramson*, 232 F.3d 83, 88 (2d Cir.2000). In deciding a motion for summary judgment, the court is to examine "the entire record to determine whether the plaintiff could satisfy [her] 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" *Id.* at 90 (*quoting Reeves*, 530 U.S. at 143, 120 S. Ct. 2097). Thus, summary judgment is appropriate when the plaintiff "has presented no evidence upon which a reasonable trier of fact could base the conclusion that [discrimination] was a determinative factor" in the defendant's employment decision. *Schnabel*, 232 F.3d at 91.

*Butts v. NYC Dept. of Housing Preservation and Dev.*, 307 Fed. Appx. 596, 2009 WL 190403 at *1-2 (2d Cir. 2009); *see also, Terry v. Ashcroft*, 336 F.3d at 138 ("[O]nce the defendant has made a showing of a neutral reason for the complained of action, to defeat summary judgment the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination.") (citations and internal quotations omitted).

## ANALYSIS

Before addressing UPS's motion, the Court will discuss Plaintiff's cross-motion to strike. Plaintiff contends that UPS failed to respond to Plaintiff's discovery request of November 11, 2016. Plaintiff demanded production of documents and served notices of deposition

---

[6] "A plaintiff's burden of establishing a prima facie case is *de minimis*. The requirement is neither onerous, nor intended to be rigid, mechanized or ritualistic." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d at 467 (citations and internal quotation marks omitted).

for six witnesses. Sanders Aff. ¶ 3, May 1, 2017, ECF No. 20. Plaintiff alleges that Defendants failed to respond to the demand. *Id*. ¶ 6. Defendants contend that Plaintiff never attempted to schedule the depositions, and that the time for discovery has now passed. Def.s' Response in Opposition to Pl.'s Motion to Strike Answer and Declarations 2, Jun. 1, 2017, ECF No. 25. The Court is aware that "[e]ven in the absence of a discovery order, a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 106–07 (2d Cir. 2002). Defendants contend that during the discovery process, they had numerous communications with Plaintiff's counsel who never raised any issue with regard to a deficiency in Defendants' response to her discovery demand. Def.s' Response in Opposition to Pl.'s Motion to Strike Answer and Declarations 2. Plaintiff's counsel, in her reply, disputes that she was at all deficient in her discovery responsibilities, but maintains that Defendants simply ignored her demand.

The Rule which authorizes the Court to impose sanctions for a party's failure to make a disclosure or discovery, states that the complaining party must certify that it has "conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." Fed. R. Civ. P. 37(a)(1). Nothing in the papers supporting Plaintiff's motion to strike indicates that Plaintiff's counsel did more than make the one demand. She did not confer or attempt to confer with defense counsel about the ignored demand. Sanders Aff., Jun. 8, 2017, ECF No. 26. Thus, although the Court has broad discretion in fashioning an appropriate sanction, in exercising that discretion, it declines to sanction Defendants. Although Plaintiff may not have had an obligation to bring a motion to compel, the discovery rules were meant to eliminate "trial by ambush."

In that regard, the Court referred this case to United States Magistrate Judge Jonathan W. Feldman. Text order referring case, Apr. 12, 2016, ECF No. 7. Judge Feldman issued a scheduling and case management order on June 2, 2016, [ECF No. 11](#), stating in part, "[a]ll motions to compel discovery shall be filed at least thirty (30) days prior to the factual discovery cutoff date." *Id*. ¶ 4. The discovery cutoff date was January 31, 2017. Plaintiff filed his cross-motion on May 1, 2017, [ECF No. 23](#). Judge Feldman's Order also specified that Plaintiff was required to make a request for an extension prior to the cutoff date. *Id*. at 3. A scheduling order "may be modified for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). Plaintiff's tardy end run around Rule 16 and Judge Feldman's Order is an insufficient basis for granting the relief sought. The Court denies his application.

Next, it is clear that Plaintiff has no cause of action against defendant United Parcel Service General Services Co. and the Court grants that defendant summary judgment.

### *Discrimination Claims against UPS*

Plaintiff argues that UPS terminated him, whereas UPS states that he resigned. Viewing the evidentiary proof in admissible form most favorably to the non-moving party, the Court accepts that, at least for the purposes of analyzing the pending motion, UPS terminated Plaintiff. Further, it is clear that Plaintiff was in a protected class: African-American. What is open to question, however, is whether Plaintiff was qualified to perform the duties for the position, and whether the termination was made under circumstances that gave rise to an inference of discrimination. Assuming, *arguendo* for this motion, that Plaintiff has met the *de minimus* standard for a *prima facie* case, he has nonetheless failed to show that UPS's proffered reasons were false and that discrimination was more likely than not a basis for his termination.

UPS has proffered three race-neutral reasons for terminating Plaintiff, all having to do with violations of its code of ethics that stresses the importance of integrity with respect to its

employees. Plaintiff has admitted the violations, but states that his Caucasian counterparts, who also violated UPS's policies, were not terminated. Further, Plaintiff claims that he went to "HR" and said that the only thing UPS liked brown were its uniforms and its trucks. Walker Dep. 151:9–12. He contends that the statement was a protected activity, and the termination was in retaliation for that comment.

Turning first to Plaintiff's claim that his Caucasian counterparts were treated more favorably than he, the Court notes that in order to prevail on such a claim, a plaintiff must show that his comparators were in all material respects in the same position as he. The Second Circuit explained this requirement in *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000), writing the following:

> What constitutes "all material respects" therefore varies somewhat from case to case and, as we recognized in *Norville,*[7] must be judged based on (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness. *See* 196 F.3d at 96. In other words, there should be an "objectively identifiable basis for comparability." *Cherry v. American Tel. & Tel. Co.,* 47 F.3d 225, 229 (7th Cir. 1995).
>
> Hence, the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical. *See Conward v. Cambridge Sch. Comm.,* 171 F.3d 12, 20 (1st Cir. 1999) (explaining that "[r]easonableness is the touchstone" and recognizing that "the plaintiff's case and the comparison cases ... need not be perfect replicas").

*Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000). Plaintiff has made general allegations that similarly situated white supervisors made errors similar to his, but that UPS did not terminate them. Plaintiff has identified four individuals whom he claims were similarly situated employees: Jeff Kessler, his former supervisor; Tom Paskowitz, a former preload su-

---

[7] *Norville v. Staten Island Univ. Hosp.,* 196 F.3d 89 (2d Cir. 1999).

17

pervisor; Jay Barnhart, his subordinate; and Brad Lynch, a full time preload supervisor in Rochester.

Plaintiff did not mention Brad Lynch ("Lynch") in his deposition testimony. In his affidavit, Plaintiff stated that Lynch "became a full time preload supervisor in Rochester. When he was not able to do the job well enough, he was allowed to return to Henrietta as a full time supervisor for local sort." Walker Aff. ¶ 44. Plaintiff's brief description of Lynch's situation is insufficient to permit the Court to determine that he and Lynch were similarly situated in all material respects.

Jay Barnhart was Plaintiff's subordinate on the unload, not a supervisor. Walker Dep. 48:18–19. Although Plaintiff testified that both Jeff Kessler and Tom Paskowitz "[f]ailed to catch a trailer that had products in it," he does not contend that they falsified a document, as he did, stating that he had checked a trailer, when he had not. Walker Dep. 64:15–23. Plaintiff specifically did not submit any information that either man had failed a yard check only four months before missing the trailer. Walker Dep. 66:25–67:7. Nor did Plaintiff contend that Jeff Kessler and Tom Paskowitz had three incidents in less than a year's time as was the case with him. Plaintiff has failed to meet the requirement that he compare conduct that is reasonably close to his situation.

Turning to the alleged protected activity, Plaintiff became a full time supervisor in preload in April 2013. His left UPS more than one year after that, in June 2014. He made his "brown" comment while he was a part time supervisor in his effort to become a full time supervisor. Further, in his affidavit, Plaintiff states that he made the comment to Jennifer Hilliard in UPS's HR department in early 2013. Walker Aff. ¶ 5, May 1, 2017, [ECF No. 19](ECF No. 19). However, in his deposition, conducted on October 17, 2016, he was asked the following questions and gave the following answers:

18

> Q. All right. Jennifer Hilliard, what does she know about this case?
>
> A. Not sure.
>
> Q. Do you [sic] have any knowledge of it at all?
>
> A. No.

Walker Dep. 168:11–15. However, "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 482 (2d Cir. 2014) (quoting *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996)), Therefore, not only is there no evidentiary proof that the statement was made to Human Resources representative Jennifer Hilliard, but there is no temporal proximity between the statement's utterance and Plaintiff's termination from UPS. In any event, "[t]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage." *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 847 (2d Cir. 2013). The comment to Jennifer Hilliard would have been made in April 2013, and his termination took place in June 2014.

UPS has proffered non-discriminatory and non-retaliatory reasons for terminating Plaintiff's employment, some of which include Plaintiff's admitted dishonesty. Plaintiff was, therefore, obligated to prove that UPS's reasons were not true, but merely a pretext for discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). It is "'not enough ... to *dis* believe the employer, the factfinder must *believe* the plaintiff's explanation of intentional discrimination.'" *Reeves*, 530 U.S. at 147 (quoting *St. Mary's Honor Center v. Hicks, 509 U.S. 502, 519 (1993)*). Here, Plaintiff has not disputed that he committed three significant disciplinary infractions in a one-year period.

## CONCLUSION

Plaintiff has not shown that the proffered reason for his termination was false and the real reason for the adverse employment action was motivated by racial discrimination. Further, Plaintiff has failed to prove he was involved in a protected activity and that UPS terminated him in retaliation for it. Accordingly, the Court grants Defendants' motion for summary judgment, ECF No. 17, and denies Plaintiff's cross-motion to strike, ECF. 23. The Clerk will enter judgment for both defendants, and close the case.

DATED: December 12, 2017
           Rochester, New York

                                            /s/ Charles J. Siragusa
                                            CHARLES J. SIRAGUSA
                                            United States District Judge